Our next case is Sfera Fine Linens v. Sfera Joven, 2123-2198. Mr. Bautista, we're ready when you are. Thank you, Your Honor. Good morning, Your Honors. Good morning. If it pleases the Court, my name is Phil Bautista. I'm counsel for Appellant Sfera Fine Linens, LLC, and we're here to appeal a decision from an opposition proceeding from the Trademark Trial Appeal Board dismissing Appellant's opposition of the registration of Appellant's Appellee's trademark, Appellee's Sfera Joven S.A. And before I begin, I'm reserving two minutes for rebuttal. Board erred in finding that Appellee's applied for mark, which was a word plus design Sfera in parentheses, was not likely to be confused with our client's mark, also pronounced Sfera, as well as Sfera Brothers. Appellant submits that the board erred in weighing several DuPont factors on likely confusion, which we'll discuss today. And because of those errors at bottom, this case should be remanded back to the board to properly weigh the evidence before it, which we'll discuss today. This Court also has the discretion to review this case and the likelihood of confusion finding of the board and reverse it. The first factor I'd like to talk about is whether the party's goods are related. The board held that the party's goods are unrelated and found that this factor weighed heavily against likelihood of confusion. And as this Court knows, the issue of relatedness of goods does not mean that the goods have to be identical. They don't have to be similar. The issue is whether or not consumers can believe that the goods are emanating from a single source. And in a case such as this, where we have a party that is not selling any goods, because this was an intent-to-use application, the fact that one party sells the goods of both parties is relevant to that relatedness, this relatedness factor. And also, this board has held that one related good between the parties is sufficient to tip the scales towards a likelihood of confusion. And really, what relatedness- So I understand that your client's company, they sell products under the name Sparrow, not only the listed goods in the trademark registration, but additional goods?  Including bathrobes and scarves. That's- And dolls, right? That is correct, yeah. Does it matter for the analysis when the sales and marketing of those particular additional goods occurred? Like, for example, this opposition proceeding started, what, in 2016? That's correct. And what if your client's company didn't start selling all of those goods until some years later, in the middle of the administrative proceeding? And therefore, it almost looks like, hey, let's try to improve our position in this opposition proceeding by starting to sell some of the very items that are listed in the applicant's itemized goods and services. That's a good question, Your Honor. And I believe the answer is no. And this was not extensively discussed. In fact, it wasn't discussed at all at the board or even in the briefing in the context you sort of raised. But just think about the issue, for example, natural expansion, natural expansion doctrine, where a registrant can protect its mark from products sold by a later user, even though it wasn't selling those products at the time because they were within the natural sphere of the goods that's related to goods they're already selling. So that's just one example of why this doesn't matter, why selling the identical or similar goods. I agree that bath robes sounds like a natural extension of the already sold bath towels and things like that. What about scarves? Well, the board itself has found in a case, it's the N. Ray Phillips Van Heusen case that we cite, that in the right conditions, right market conditions, as we'll also discuss in this case, that linens, including towels, and clothing such, in this case it was shirts in the N. Ray Phillips Van Heusen case, are, in fact, related. And the reason why that was in this case is there were market conditions that showed that consumers could believe that these products were emanating from a similar source. And the panel submits that that is the case here. So to round out your question, Your Honor, it is not important for a panel to have been selling the exact similar identical goods to demonstrate relatedness that consumers could believe that these goods are emanating from the same source. And I might submit to you, Your Honor, that Appellant was selling at least some of these goods robes before the application date of Appalee, which was December 12, 2014, I believe. And if I could give you some appendix sites to that, our client was selling robes. Appendix 107, paragraph 8, authenticated this. In 2009, that's appendix 573, 766. And again, there's evidence of the record, sales of robes in 2012, appendix 723, sales of robes generally, appendix 353. And post this application, there's also evidence of sales of scarves, and robes, and diffusers, and candles. Those appendices are in our brief, but I can very quickly give you some. That's OK. We have them in your brief. OK, great. What about the question of foreign use? That was sort of disparaged, wasn't it? Foreign use. Well, foreign use related to the trade channels issue. The trade channels. And we can go to that, if you'd like. That's one of your soft points, relatedness of goods and channels of trade. The board found, in your direction, on distinctiveness. It held the mark was conceptually strong, somewhat strong, commercially. And in terms of similarity of marks, they differ by only one hour. But found against you on relatedness of goods and channels of trade. And the foreign sales were held against you. That's right. Do you want to comment on that? I do, Your Honor. And with respect to the similarities of the party's trade channels, we think that the board heard as well. With respect to foreign evidence of trade channels, the board stated that references originating from foreign countries are not prohibitive for the purposes of this. I think that's the language that they used. That's actually not true. Foreign evidence can be considered by the board on a case-by-case basis. That's the N. Ray Bayer case from this court that is cited in the briefing, as well as the board itself has considered foreign evidence. That was for a different context than trying to figure out what would be the trade channels in the United States, right? That is true. Bayer was more about, let's try to understand the meaning of this term. That is true, Your Honor. But for Appellant, that is a distinction without a difference. If you look at what the consumers were doing in that case, they were making reference to foreign publications and websites, a trade channel used by these companies in that case. And I can think of no better circumstance to consider foreign evidence in this case where Appley essentially concedes that it is selling its products through the internet, on sales on its website, and through retail stores, which are exactly the same trade channels as our client through its website and through third party retailer websites, as well as through retail stores. They can see this point. It is reality. That is their trade channels. In addition to that, and beyond the evidence, if you just look at the description of the party's trade channels in their applications or registrations, there are no restrictions to it. And what the board should have considered then, because there are no restrictions of trade channels in the registrations and applications, is that they travel in the same trade channels as the same consumers. The board cited a case in retail to say that the goods had to be identical in order to apply that presumption. Well, I think they have to be identical or at least similar, right? Well, it's not. They can be totally dissimilar, and then we just assume that they travel in the same trade channels. That's true if we're talking about automobiles and pens, certainly. Those are too distinct. But in that case, it wasn't identical. That's not what In Re Vitera held and what the board measured. They said that it had to be identical. Actually, they do have to be similar, as you point out. And I think that's a Hewlett Packard case that is actually cited in the In Re Vitella case. But as we pointed out earlier, there are some similar goods that our client is selling. And it's back to the bathrobes and scarves argument? That's correct. And when you went on your bathrobes and scarves argument, assuming we were to vacate and remand on that, then there's a chance you could prevail on your trade channels argument. We could also prevail, if I can go on to the next topic as well, if you consider the kind of consumers that our client has. And the answer is yes. And it does dovetail into my next topic, an error by the board which held that the overlap of consumers of the parties was a neutral factor. This was a very puzzling ruling by the board, because the board held that both parties, based upon their descriptions of goods and their applications and registrations, held that they both sell basic and expensive goods. And to that point, Your company sells basic and expensive goods? I thought you showed, oh, you're saying you sell some cheap stuff, but mostly expensive stuff. Yes, we sell some cheap stuff. What's your cheap stuff, though? I have some appendix sites, if you'd like. Just tell me what it is. I don't care about the appendix. OK, robes, candles, clothing for less than $30, shams, bedding, towels. Clothing for less than $30? Yes. What clothing do you sell that's less than $30? Maybe socks.  I thought. Yeah, is a $30 pair of socks cheap? Because I don't think so. I mean. Well, you've got the bathrobes, you've got the scarves. You haven't identified any other item of clothing that you sell. So that's why I'm asking. I mean, is this the same bathrobe that you sell to the willer? Because if it is, I can't imagine it's cheap. So robes are a wide range of robes, yes. But we do have this price. The price I have here. Here's my problem with this argument is, the overall sense from all of your papers and all of the things, it looks like where your sell stuff is. You're a Lima Marcus Saks brand. And I don't want to disparage them, but they look like they're more like Walmart or Target or something like that. I'm not disparaging because I can't afford to shop at Lima Marcus and Saks. I'm more likely to shop at Target. Those are two very different things. Wouldn't you agree? Consumers of those stores are largely two different sets of consumers too. I would say that there are differences between Lima Marcus and differences between Walmart, but they're both retail stores which are considered the same trade channels. And the issue is not necessarily do they sell in the right, in the exact same stores or on the exact same website. The issue is whether their products- I don't see how that can be necessarily true if it's this kind of market. Maybe if there's something that's sold for the same price and it doesn't matter where they're sold. But a bathrobe at Target and a bathrobe at Lima Marcus are almost never going to be the same price, never going to be the same quality, not directed to the same kind of consumer. So there it seems like it should be very relevant. Well, I'm not saying that our client doesn't sell what they call luxury items. They do, but they also sell inexpensive items. Like a $40 diffuser? A $40 diffuser, I think, is not- that's market. I don't think that that's expensive for a- You should not run for political office in this country. Well, I wouldn't want to, Your Honor. Maybe he should not. I wouldn't want to. I'd like to point out a case, the Enrique Occitano case, which suggested that even though two parties might have different goods, some sold to some kind of consumers, some sold to other consumers- So you want to save a couple of minutes, and your time has almost run out. So we'll give you two minutes for rebuttal. Yes. And we'll hear from the other side. Thank you. Mr. Pamius. Good morning, Your Honor. May it please the Court. For the record, Samuel Pamius. Your Honor, we believe that the board's decision should be sustained. It should be sustained because they applied the proper standard when they analyzed these two trademarks, ESFERRA and ESFERRA. And I beg the point- When you look at the various issues, they seem to be against you. The board found that there was a presumption of distinctness, and so the mark was conceptually strong and commercially somewhat strong. And they're very similar. And so those were two findings against you. It found that consumer sophistication factor was neutral. So that's neutral. And only unrelatedness of goods and channels of trade did they find in your favor. And that's not so clear. So why shouldn't we reverse? Well, Your Honor, although I'm going to go one by one. Although we believe that these trademarks share similarities, especially in English. For me, that I speak Spanish, ESFERRA and ESFERRA sound completely different. And although we understand that the relevant public is an English-speaking consumer. So that part I can understand. But in terms of the problem in this case, it's a problem of evidence, admissible evidence. And that's something that the court should take in consideration. The evidence that was submitted by Appellant, although it looks like a lot of evidence, when you go through all the exhibits and you look at everything. And then you go specifically to what evidence have they produced to prove that they have goods that are similar. Then you have the goods that Your Honors have mentioned, the scarves, the robes. And when you look at how many exhibits there are, there are four, four in the appendix. And those exhibits, they really don't have any sworn statement to support or to show that those goods are being sold in the U.S. market. I thought they had two declarations that said so. Yes, and I'm going to point exactly at the Appellant's sole reply to our brief. Because when you read it, the specific portion that they cite, you there can tell that what they're talking. And I think it helps the court if I read it directly. What they indicated is that, let me look exactly because I have it right here, just a second here. They indicated that, let me turn my head right here just a second. When you look at the sworn statement, Your Honor, they talk about marketing. They indicate that they use the, let me just go directly to the, and they have exhibits, photos from a website, right? Yes, Your Honor, and the board correctly points out and said that those photos, they cannot be used to support the truth of what they're alleging that those marks are in the market. I mean, those exhibits are very old. I mean, like some of them are from 1988, I believe. If I can go directly. It's not clear to me that the trademark board addressed these specific pieces of evidence that the opposer pointed to and relied on related to bathrobes and scarves and candles and diffusers. Judge Shen, they did. They indicated that those opposers also relied on the alleged common law use of isosferamide for bathrobes, scarves, diffusers, and candles without including any evidence of use prior to applicant's priority filing date. I'm sorry, what page are you on? I have a, I just summarized. What page of the trademark board decision are you working from? Let me look exactly in which. Let me get the. If I may, Your Honor, grab the other five because I have it on the. Oh, I see. You're at 814, 815. They do make that specific remark. So the board really went through all the factors one by one.  And when they made the just like I want to point out specifically to the. Okay, here we go. The applicant citing a portion of the declaration testimony of his president and CEO and vice president responsible for brand development and business expansion. And it's in its declaration says, while the ownership of the company and the Sfera Broads and Sfera trademarks have changed hands several times, the trademarks have been used continuously by these owners. Attached are true and correct copies of historical and current marketing materials that demonstrate the history of the brand. And here's the problem that I have with that statement, that that statement is supported with hundreds of documents. You really do not know specifically which document supports specifically which part of those statements. You do not know exactly. And the problem is that those four documents that they make reference to, they may very well be over there. But as Judge Chen pointed out earlier or asked, you cannot tell when these marks were being used. You cannot tell if they're being used still today because they're mixed. The problem I have with one part, one problem I have with the Ford decision is that it appeared to be looking at this evidence with respect to bathrobes and scarves through the lens of trying to figure out whether the opposer had established common law rights and priority rights to those goods and services. And did not really address what I saw was an additional separate argument being made by the opposer, which was that there is evidence in the record, i.e. me, that is selling goods that the applicant has identified in its intent to use application, that clothing and perfumery. I believe, Your Honor, there might be one. And so, therefore, the board didn't address that aspect of the opposer's argument in this board decision. Well, that one particular item that you mentioned, I don't recall them discussing it directly. And then we have a case law, I think it's Hewlett-Packard, that says when there is evidence that a company sells the goods of both the registrant and the applicant, that is evidence that the goods can be thought of as related goods. Yes, Your Honor, but I believe in the Hewlett-Packard case what they're talking about is when the goods are identified in the application and in the registration. We're not talking about goods that are sold on the market. I think what that case talks specifically is about goods that are shown on the trademark application and on the trademark registration. Well, what if I disagree with your reading of Hewlett-Packard? And it's more like if the registrant sells books and the applicant sells pencils and then evidence is put forward that some third company sells both books and pencils, then that's evidence that maybe books and pencils are related goods. Okay, okay, I see, I see. But the problem over here is that I don't feel that they have produced that kind of evidence for the record, admissible evidence. And that's exactly the problem that I see, that this case has a problem of lack of admissible evidence as to that regard, that other companies are selling the same type of products in the market. For example, something that Apple has mentioned several times in their briefs, that they point out that the board made a mistake by not accepting evidence of products of the same kind being sold abroad or how their products are sold in the market. They could have found evidence of companies that do the same thing in the United States and use it as evidence, I believe. So that's something that I believe that is lacking on their part to produce that kind of evidence in order for the board to be in a better position to make its determination. What about similarity of the marks? My understanding is the board found that Sfera and Sfera, Sfera and Sfera are more similar than dissimilar, which sounds like a much more weak finding than finding that the marks are highly similar and weigh heavily in favor of likelihood of confusion. Do you think there's a deficiency there, given the seemingly high degree of similarity of these two marks? Your Honor, I feel that they made the appropriate decision in that regard. I think the board was fair in terms of how they viewed these trademarks. These trademarks, admittedly, they're not identical. And they can be distinguished. They have two R's. I mean, like the Appellant's trademark has two R's. Like I said before, and again, I understand that the relevant market is the U.S. and English-speaking market. But in Spanish, for example, having two R's makes a world of difference. In English, maybe not so much. But nevertheless, that doesn't mean that a consumer cannot look at the trademark and see the differences right away. Because, I mean, either they misspelled the word or something happened. I guess the question is, why shouldn't we vacate and remand just on that factor? Because the Trademark Board did not have the benefit of this court's Natera decision, which came out, I don't know, a couple years ago. And I believe for the first time really highlighted the notion that when marks, the competing marks, are really similar, that should count not only in favor of likelihood of confusion, but should weigh heavily towards a finding of likelihood of confusion. Well, Your Honor, the way, first of all, I do believe that Appellant has had the chance to argue at least before this board Natera case. And I understand that they, I mean, I'm sorry, that the board did not have the chance. But the Natera case is different from this particular case. Because in this particular case, the court made an analysis of all the DuPont factors and explained them very well. I believe that the board, when they analyzed the similarities between the trademarks, they did do a good job. They reviewed the trademarks and they said that they're similar. And they move on to the other factors to analyze how the trademarks are found on the trade channels, how the trademarks are found, how related are the goods. So they move on to the other factors. And from my perspective, they did perceive correctly, as you also perceive, that the trademarks are similar. I don't know if they're very similar, but they're similar. I mean, there are plenty of case law from this court and the board that sustain that although some trademarks may be very similar and shared, they're almost identical, that they can coexist in the markets because consumers can tell the difference from one another, even if it is one letter, the difference. And I think we cited plenty of... Has your client begun marketing any goods in the United States? Not yet, Your Honor. Not yet. I believe they're close, but they have not begun to do so in the United States yet. Do we know where they're going to sell their goods? None that I know of. Like the department stores? I really cannot answer that question because I would be definitely, I would be guessing right now. I know what they have done in the past. They have sold those goods in the Corte Ingles, which I don't know if you know. In Spain, it's like a department store. And they have done it through the Internet. And that's something that I want to point out specifically because Appellant points out constantly that we have conceded that the trademarks are in the same channels of trade. And that is a mistake or that's not correct. When we made that statement in the brief, what we said specifically is in general terms, and that makes a world of difference to us, we said in general terms, this trademark can be found here and here. We said in department stores and the Internet. But we didn't say, well, it's going to... We said in general terms, we are not for sure where the trademark is going to be used in the United States. So it's not that we're conceding that it's in the exact same stores, because that's what I feel that Appellant is trying to point out, that these trademarks are going to be on the same stores. And that is incorrect. That's not an allegation that we have made. Thank you, counsel. As you can see, your time has expired. Thank you very much. Thank you. Bautista has two minutes for a vote. I just wanted to address a few points with respect to the trade channels. Appley argues that we didn't present evidence of how other companies sell the party's products. That's actually not true. We did submit, and I think I discussed in my first session, that we presented evidence of how third-party retailers like Nordstrom and Neiman Marcus sell the goods, and they sell them online. So that is actually inaccurate with what opposing counsel said. With respect to the similarity of the marks and the comment about NREI and NTERA, we do believe that when this court is reviewing the board's order de novo, that the fact that the party's marks are similar, even more similar than not, that this weighs heavily in favor of a likely confusion finding. That's NREI and NTERA, as Judge Chen pointed out. And, in fact, the board has acknowledged this, and I fit the doll. They asked this board to remand the case because of that fact. As to the declarations and evidence that you relied on below to try to show that you yourself sell goods that are listed in the applicant's application, the other side just said that that evidence was balanced for lack of admissibility, that the board rejected it. Is that correct? I don't think that is correct, Your Honor. I think that's an argument that they are making. I think that the board didn't reject the evidence. I don't think the board considered it. I think it didn't consider the fact that a lot of the exhibits to the declaration What does it mean when the board at A15 says, The materials in opposer's NOR, which are not supported by accompanying testimony, are not admissible for the truth of the matters asserted therein, but instead are admissible only for what they show on their faces? Is that in relation to your two declarants talking about how your client's company has sold bathrobes and scarves? Yes, but only because at that point in time, you're not supposed to submit declarations that are to verify and authenticate those exhibits with the Notice of Reliance. We did that in the trial period. We used the same identified exhibits in the Notice of Reliance, and then we used declarations as testimony to verify those documents. Sure, the fact that no declarations submitted in the Notice of Reliance occurred, but we did that at the appropriate time during the trial period. Thank you, counsel. As you can see, your time has expired. The case is submitted. Thank you.